UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA BROWN,

      Plaintiff,

v.

CENTERRA GROUP, ET AL.,

      Defendants.

_____/

Case No. 17-12643

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
MONA K. MAJZOUB

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]**

Cynthia Brown, an African American woman, was employed as a protective service officer ("PSO") at the Patrick V. McNamara federal building in Detroit until her employment was terminated on December 11, 2014. On December 3, 2014, Officer Brown was involved in an altercation with an immigration attorney who entered the building on business. Both the Federal Protective Services ("FPS") and her employer — the contractor Centerra Group — investigated the incident. Following the investigation, Officer Brown was terminated. She then grieved her termination through a union-sponsored arbitration. The arbitrator found that she was terminated without just cause and ordered backpay and reinstatement. Because she has yet to complete required training and paperwork, Officer Brown has not been reinstated.

She brought this suit alleging that she was fired in retaliation for filing an EEOC complaint and on account of her sex and race. Defendants have moved for summary judgment, arguing that Officer Brown was fired because of her conduct, not because of any protected characteristic. For the reasons discussed below, the Motion for Summary Judgment [46] will be granted.

## FACTUAL BACKGROUND

Former PSO, Cynthia Brown, had worked for Defendant Centerra Group, LLC, since it — then branded G4S Government Solutions — took over the contract for security services from DECO, her previous employer, at the Patrick V. McNamara federal building in 2014. Plaintiff had previously filed an EEOC complaint against a number of her supervisors from DECO who continued to act as her supervisors in Centerra. One of the allegations in the EEOC complaint was that Defendant Michael Szymanski, her supervisor, made a racist statement when he reminisced about working in Hamtramck, where one could beat people with hoses. (Dkt. 57-2, Pl. Ex. 1, Deposition of Cynthia Brown at 270).

On December 3, 2014, at around 11:00 a.m., Officer Brown left her position to drink some water. (Brown Dep. 172). Brown was assigned to the controller spot, while PSO Donovan Hollis was in the greeter's spot. Due to a miscommunication, where Brown failed to relay to Hollis to "hold the line," no one was there to screen attorney Oana Marina when she came into the building. Marina took off her shoes

to pass through the metal detector, placed them on the belt, and then by her own affidavit was waiting by the belt for the shoes to come through when Officer Brown accosted her. (Dkt. 46-6; Def. Ex. E).

At this point the facts become disputed. Officer Brown maintains that Marina attempted to run her shoes through the x-ray machine herself, and then when Officer Brown confronted her and asked her to proceed to the end of the table, Marina became physically and verbally combative, causing Officer Brown to apply minimal amounts of force to shepherd her to the end of the table. Officer Brown testified that she overheard Marina confessing to FPS officers that she had had a few cocktails over lunch. (Brown Dep. 339). This detail did not make it into the FPS report.

Marina recounted that she was pushed from behind by Officer Brown, away from the x-ray machine, and then exchanged words with Officer Brown over her rudeness, including a threat to report her to a superior. (Dkt. 46-6; Def. Ex. E). Then, after she walked away and assumed that she was free to proceed, Brown and a male PSO grabbed her from behind, pushed her against the wall, and handcuffed her, resulting in injury. Marina denied drinking alcohol that day. (*Id.*).

Officers Donovan Hollis, Kenneth Davis, and Everette Wilson, all of whom were also PSOs on duty and participated in Marina's arrest, submitted statements as part of the G4S investigation. They both described how Marina walked through the metal detector unbidden and then became verbally aggressive when Officer Brown

asked her to move down to the end of the table, at which point she began screaming. (Dkt. 57-11, Pl. Ex. 8; Dkt. 57-14, Pl. Ex. 10(B); Dkt. 57-15; Pl. Ex. 11). By their accounts, Marina was asked to leave the building, refused, and was then handcuffed and turned over to the custody of FPS. (*Id.*).

FPS thereafter prepared an incident report based on a review of the video footage of the incident and interviews with the officers and Marina. (Dkt. 46-14, Def. Ex. M, PageID 932-933). That report suggested that Officer Brown was "engaged in conversation" away from her post with PSOs Davis and Wilson when Marina went through the metal detector and set off the alarm. It notes, based on the video, that Officer Brown took Marina's tub of personal items and slammed it down on the furthest table from Marina. It further alleges that Officer Brown then pointed to the end of the table, and, when Marina did not move, "shove[d]" the attorney with her right arm. Marina then took out a notepad and jotted down something, stopped to say something after gathering her belongings, and then began walking into the building. Brown and Wilson stopped screening to try to get Marina's attention, and when they could not they followed her out of range of the camera. When FPS agents encountered Marina, she was crying, her face was cut, and her wrists were bruised from the handcuffs. (*Id.*).

This Post-Inspection Form was emailed from Joe Lang, the Contracting Officers' Representative of the FPS. The email noted that "two negative 2820s" were

attached regarding PSOs Brown and Wilson. The email asked for a response by close-of-business December 11, 2014. (Dkt. 46-4, Def. Ex. C., PageID 698).

On December 11, 2014, a letter from Mark Carruthers of the Washington Operations branch of G4S sent Officer Brown a letter that as a result of the incident, her employment was to be terminated on December 11, 2014. (Dkt. 46-7; Def. Ex. F). Officer Brown's union contested the termination and filed a grievance on December 16, 2014, which went to arbitration pursuant to the collective bargaining agreement. An arbitration hearing was held on May 4, 2016, with both parties represented by counsel. Centerra Group argued to the arbitrator that Officer Brown had committed four serious infractions of work rules in the Discipline Matrix, including failing to take appropriate action for the safety of the client, violating security procedures, being inattentive to duty, and disorderly conduct. (Dkt. 57-5, Pl. Ex. 4, pg. 9). Because the arbitrator who conducted the hearing died, a new arbitrator was chosen by the parties to render a decision.

On April 11, 2017, that arbitrator, Stanley Dobrey, decided that Centerra had failed to present adequate proof that Officer Brown even committed an infraction. (*Id.* at 29). He noted that Centerra had inexplicably lost or failed to record its conversations with Oana Marina, and that it had produced only hearsay to rebut Officer Brown's version of the facts, that she applied minimal force to a recalcitrant visitor after returning from a permitted water break. (Dkt. 46-8; Def. Ex. G).

During the pendency of the arbitration, Officer Brown obtained a few part-time jobs, including substitute teaching positions at several schools and a temporary position at TJ Maxx. (Brown Dep. pg. 57-58). She eventually settled on a part time position at Wayne County Community College as a security guard. (*Id.*). The position was subsequently expanded to full-time, though her salary seems to have remained lower than what it would have been at Centerra. (*Id.* at 41, 59).

The Arbitrator ordered that the termination be set aside, and that Officer Brown be reinstated with backpay. Officer Brown deposited the check for backpay in the amount of $78,043.25. She has not been reinstated, however, because she has not filled out required paperwork, nor completed required training. (Dkt. 46-10; Ex. I). Officer Brown, in her emails with her supervisors, expressed difficulty with getting away from her job at Wayne County Community College to attend trainings scheduled in July of 2017. (Dkt. 46-10, Def. Ex. I; Dkt. 57-17, Pl. Ex. 14).

## PROCEDURAL BACKGROUND

Plaintiff filed her Complaint on August 11, 2017. [Dkt. # 1]. She filed an Amended Complaint [6] on November 14, 2017. Discovery opened on March 28, 2018 and closed on September 7, 2018. On November 8, 2018, Defendants filed a Motion for Summary Judgment [46]. That motion was fully briefed, and a hearing was held on September 5, 2019.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Movant bears the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-movant lacks evidence to support an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Non-movant cannot rest on the pleadings and must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87. Non-movant must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Rule 56(e)).

## ANALYSIS

Plaintiff pleads discrimination and retaliation under Title VII of the Civil Rights Act and Michigan's Eliot-Larsen Civil Rights Act ("ELCRA"). Michigan courts analyze ELCRA discrimination claims under the same test used by federal courts for Title VII discrimination and retaliation suits. *See, e.g., Major v. Village of*

*Newberry*, 316 Mich.App. 527 (Mich. Ct. App. Aug. 2, 2016). The Court will therefore consider its ruling on the federal claims to be dispositive of the state claims.

**1.      Title VII Sex and Race Discrimination**

"Absent direct evidence of discrimination, claims brought pursuant to Title VII's antidiscrimination provision . . . are subject to the [McDonnell Douglas] tripartite burden-shifting framework[.]" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Under the McDonnell Douglas framework, "[t]he burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext-i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Since Plaintiff has provided no direct evidence of discrimination, the Court analyzes whether she has met her burden to make out a prima facie case of discrimination.

I.      Prima Facie Case of Discrimination

To establish a prima facie case of employment discrimination, Plaintiff must demonstrate that she: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).

Prongs (1) and (3) are undisputed. Defendants contest prong (2), arguing that Plaintiff cannot show that she was qualified her job, because when she detained Marina, she did not meet "the legitimate expectations of her employer." *See Brahmbhatt v. Gen. Prods. Corp.*, 2014 U.S. Dist. LEXIS 81592, at * 31 (S.D. Ohio June 16, 2014). A plaintiff's failure to adequately perform her job is a bar to making out a prima facie case of discrimination. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003) (*en banc*). Nevertheless, the fact that an arbitrator found that Brown's actions were not grounds for discharge makes it impossible to conclude that a reasonable jury couldn't reach the same conclusion. There is at least a fact question as to whether Plaintiff was qualified for her job.

Plaintiff fails to prove prong (4), however, which, in a case like this, requires evidence that she was treated worse than non-African-American or non-female employees. "In the disciplinary context . . . the plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). "To determine whether two individuals are similarly situated with regard to discipline, [the court] make[s] an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee." *Id.* (internal quotation marks omitted). Similarly situated employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the

same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff in this case offers as comparators two male, African-American officers, Wilson and Davis, who were disciplined but not terminated after their role in the Marina incident. Any disparate treatment between Brown on the one hand, and Wilson and Davis on the other, can only prove gender discrimination, not race discrimination. Wilson and Davis are not suitable comparators for this, however, for both engaged in less egregious conduct than Brown. Carruthers summarized the level of sanctions as follows:

> While it is true that Officer Wilson helped detain Ms. Marina, we determined that his conduct was less egregious than Officer Brown's and that he had less culpability. It was our opinion that Officer Brown displayed a serious lapse of judgment when she escalated a non-threatening situation with Ms. Marina. She should not have allowed Ms. Marina to go through the magnetometer a second time after it alarmed, shoved Ms. Marina, walked her belongings to the farthest end of the tables, or slammed down her tub of belongings. Indeed, it was our opinion that Officer Brown put into motion the later attack and detention, which occurred off camera.

Dkt. 46-4; Def. Ex. C; ¶ 30.

Officers Wilson and Brown were, according to the FPS report relayed to Centerra Group, lesser participants in the Marina incident, and they were given correspondingly lesser sanctions. Because Wilson and Brown were disciplined according to the content of the FPS Report, and not their actual conduct, Brown's

testimony contradicting the FPS report does not create a material of question of fact as to whether their sanctions were lesser due to their gender.

Plaintiff also offers as a comparator one of her coworkers, an Officer Parker. She testifies that Parker, along with several other male colleagues (race unmentioned), were assigned more favorable permanent full-time placements, Szymanski kept Brown "roving" from station to station, which resulted in fewer hours per week. (Brown Dep. 265-267). Plaintiff also noted that she was reprimanded by Szymanski for not backing up Parker in a fight, but Parker received no such reprimand when he failed to back up Brown when she had to chase away a teenager with a firearm from the Social Security Offices. (Brown Dep. 273-75). Parker also apparently slept on his shift but received no discipline. (*Id.* at 355). Parker cannot be a comparator, however, because his infractions — sleeping and failing to provide backup — are not analogous to the conduct for which Plaintiff was sanctioned.

Defendants offer a declaration by Robert Handel, Manager of Employee Relations at Centerra Group, who noted that Centerra Group has discharged 32 individuals from the Patrick V. McNamara building since December 1, 2014, excluding Officer Brown. (Dkt. 46-5; Def. D; ¶ 16). Of the 32, 26 were male and 6 were female; 18 were African American and 14 Caucasian. (*Id.*).

Plaintiff's only evidence of racial animus on behalf of Defendants is the deposition testimony of Kai Mason, who served as the project coordinator of Deco from 2009 to 2014, but who was not rehired by G4S when it took over the contract. (Dkt. 57-4; Pl. Ex. 3; pg. 8-9). Mason testified that two African American employees of DECO made complaints against Jennifer Burns, reporting harassment and belittling. She also testified that complaints were made against Burns on her perceived favoritism of Caucasian employees regarding scheduling. (*Id.* at 15-25). As to Szymanski, Mason testified that employees did file complaints of racial discrimination against Szymanski, but the nature of these complaints were not mentioned in the deposition. (*Id.* at 30). Lastly, Mason asserted that Officer Brown's EEOC complaint was common knowledge at the workplace. (*Id.* at 34).

Though Mason's testimony could establish circumstantial evidence for racial animus on behalf of Burns, it would not establish the same for Szymanski. Critically, there is no indication that Burns played any role in the termination of Officer Brown. Moreover, Mason's testimony does not provide any evidence of how Officer Brown was treated differently based on her race.

II.  Cat's Paw Liability

Even if Plaintiff were able to make a prima facie showing of discrimination, she would still also have to prove that the allegedly biased decision-makers at Centerra were also the ones who caused her to be terminated. Under the cat's paw

theory of liability, which Plaintiff admits she must satisfy, "if a supervisor performs an act motivated by [racial] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

> The intent element is satisfied if the supervisor believes the adverse action substantially certain to result from his act. The proximate cause requirement 'excludes only those link[s] that are too remote, purely contingent, or indirect.

*Id.* (internal citations omitted).

Defendants have provided an FPS Report demonstrating that at least the initial response to Plaintiff's altercation with Marina was handled by Centerra's client, not Centerra itself. Defendant performed a parallel investigation, but that it was limited to gathering facts and forwarding that information to the Program Manager to make a decision on what recommendation to make. (Szymanski Dep. 112). He did, however, sign the letter to Carruthers recommending Brown's termination, and so that recommendation will be imputed to him for the purposes of this motion. (Dkt. 57-8; Pl. Ex. 6(B)).

Mark Caruthers testified that he and "the corporate team" independently reviewed video evidence, employee statements, and the FPS report, and made the decision to fire Officer Brown, a decision that Szymanski was not authorized to make. (Dkt. 46-4; Def. Ex. C, ¶¶ 23-25). Robert Handel's declaration specifies that

he travelled to Detroit, along with senior vice president Richard Allen, reviewed the camera footage seven times, including in slow motion and freeze frame. (Dkt. 46-4; Def. Ex. D; ¶ 8). Handel has asserted that he, Allen, Carruthers, and Centerra Director of Labor Relations, Mike Goodwin, collectively made the decision to terminate Officer Brown. (*Id.* at ¶ 13).

"An employer will not be liable for its intermediate employee's discrimination if 'the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action.'" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012) (quoting Staub 131 S. Ct. at 1193). Nevertheless, a biased supervisor's recommendation could be sufficient to trigger cat's paw liability if it were relied upon by the decisionmaker.

> Neither independent investigation nor independent judgment on the part of the employer provides a per se defense. For example, if the intermediate supervisor makes a biased report to the ultimate decisionmaker, it may be a causal factor in the adverse action if the independent investigation by the employer takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. Also, if the independent investigation relies on facts provided by the biased supervisor, then the investigation was not, in actuality, independent and the employer is liable.

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012)

Plaintiff's problem is that she only even alleges discriminatory intent against Defendants Szymanski and Burns. Burns' undisputed testimony is that she removed Brown from the schedule for the rest of the day after the Marina incident. (Burns

Dep. 99; Pl. Ex. 7(A)). She also wrote a statement to Szymanski after watching the video of the incident. (*Id.* at 143-44). In other words, Burns played no part in the decision to terminate Brown.

Szymanski, for his part, wrote a two-page memo on December 10, 2014 to Carruthers recommending that Brown be terminated. The memo provides little detail or information of substance. Szymanski introduces exhibits, including the FPS reports and statements by Wilson, Hollis and Davis, and details his internal investigation. (Dkt. 57-8; Pl. Ex. 6(B)). His recommendation might have carried enough weight to be considered the cat's paw, but for the fact that the Centerra Group decision-makers flew to Detroit to personally review the video, the statements, and the FPS reports. There are no facts in the Szymanski report that the corporate officers wouldn't have seen anyway in their own review,[1] and there is no evidence to rebut the corporate officers' testimony that their decision was independent.

III. Pretext

Even if Plaintiff had made out a prima facie case, she would hardly have been able to demonstrate pretext. Once the plaintiff makes out a prima facie case, the

---

[1] During the hearing, Plaintiff's attorney suggested that a misinterpretation of a covert testing was included in the report. The report contains an exhibit of a "Negative 2820" that was emailed from FPS regarding the covert testing, however, not Szymanski's interpretation of the covert testing. (Pl. 6(B), Dkt. 57-8).

burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions . . . [then] shifts back to the plaintiff to show pretext." *Chen*, 580 F.3d at 400. Plaintiff can demonstrate pretext by showing: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's action; or (3) that they were insufficient to motivate the employer's action." *Id.* "[P]laintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (internal quotations omitted).

Plaintiff must rebut that the proffered rationale was the actual rationale used by the decisionmakers. It is not sufficient to prove that the rationale was wrong.

> If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous.

*Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).

Even if the arbitrator were correct, and Plaintiff's conduct did not provide a sufficient basis for termination, Plaintiff has not provided evidence to rebut Defendants' testimony that they terminated her employment because their client, FPS, wrote a negative report detailing an assault on an attorney visiting the building on business, and that the corporate officers' review of the video corroborated that report. Plaintiff has only offered comparators outside of her protected class for her gender discrimination claim, and the only other evidence of gender discrimination

she offers is that she, unlike two male colleagues, was not given a permanent post. This is not sufficient evidence of bias to disprove Centerra Group's stated rationale.

**2.      Title VII Retaliation**

Plaintiff alleges that she was terminated in retaliation for her November 2012 EEOC complaint against several of her DECO supervisors, including Szymanski.

In order to state a claim of retaliation under the federal civil rights laws, a plaintiff must establish by a preponderance of the evidence:

> 1. That she engaged in a protected activity;
> 2. That the defendant knew of this exercise of her protected rights;
> 3. That the defendant consequently took an employment action adverse to plaintiff; and
> 4. That there was a causal connection between the protected activity and the adverse employment action.

*Hoffman v. Sebro Plastics, Inc*., 108 F. Supp. 2d 757, 775 (E.D. Mich. 2000) (citing Fenton v. HISAN, Inc., 174 F.3d 827, 831-32 (6th Cir. 1999).

Defendants dispute the second and fourth prongs. They cite the Carruthers declaration for the fact that no corporate officers of Centerra Group knew that Plaintiff had previously filed a complaint against her supervisors at DECO. *See Reeves v. Digital Equipment Corp*., 710 F.Supp 675 (N.D. Ohio 1989) (a retaliation claim is not actionable where the adverse employment action was taken prior or the decision-maker learning of the EEOC complaint). Plaintiff does not dispute this, but she argues instead that Szymanski and Burns knew of the EEOC complaint. Their knowledge is irrelevant, however, for the reasons discussed in the cat's paw liability

section of this Opinion. Since Szymanski and Burns were not decisionmakers and did not motivate the termination decision, their knowledge cannot be imputed to the decision to terminate Brown.

The fourth prong of the retaliation analysis requires Plaintiff to muster evidence of causation. "Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997). Plaintiff has provided no evidence of causation aside from general scheduling disputes with Szymanski. Even if these disputes were motivated by her EEOC complaint, she cannot avoid summary judgment absent proof that Szymanski's ill-will motivated her termination.

## Conclusion

Plaintiff has not carried her burden of building a prima facie case of discrimination. She proved neither that she was treated worse than similarly situated employees outside of her protected classes, nor that the supervisors against whom she alleged bias influenced the decision to terminate her. Even if she had met her prima facie burden, Defendants would still be entitled to summary judgment because Plaintiff failed to provide any evidence that their stated reason for terminating Brown was pretextual. She also fails to advance her Title VII retaliation case. There is no evidence that any decisionmaker at Centerra Group knew of her 2012 EEOC

complaint against DECO, and there is no evidence that any retaliatory impulse by Szymanski had any effect on Centerra Group's decision to terminate Brown.

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [46] is **GRANTED**.

**SO ORDERED**.

|  |  |
|---|---|
|  | s/Arthur J. Tarnow |
|  | Arthur J. Tarnow |
| Dated: September 26, 2019 | Senior United States District Judge |